UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>CARL HENDERSON,<br><br>Defendant. | : | CASE NO. 1:07-CR-68<br><br>OPINION & ORDER<br>[Resolving Doc. No. 46] |

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

With this Opinion and Order, the Court decides whether to grant Defendant Carl Henderson's ("Henderson") motion to suppress statements obtained by the police as the result of a January 11, 2007 search of the residence of Henderson and his wife and co-defendant, Tekora Madden ("Madden"). In considering this motion, the Court incorporates its analysis and conclusion as to the admissibility of evidence obtained from the January 11, 2007 search of the couple's residence at 2350 Wynde Tree Drive in Seven Hills, Ohio ("Wynde Tree Residence"). In this action, Henderson's co-defendants include Madden, Gerald Taylor ("Taylor"), and Maruion Lewis ("Lewis"), each of whom have filed motions to suppress that the Court separately considers.

For the reasons presented below, the Court **GRANTS** Henderson's motion to suppress as it relates to statements obtained as the result of the January 11, 2007 search of the Wynde Tree Residence.

I. Background

On January 11, 2007, United States Drug Enforcement Agency ("DEA") Special Agent Lee Lucas ("Lucas") directed an on-going undercover investigation of a suspected PCP distribution ring involving individuals in Los Angeles and Cleveland. Trial Tr. at 9 (Mar. 16, 2007). The PCP conspirators allegedly included Henderson, Madden, Lewis, and Taylor. *Id.* With respect to the January 11, 2007 events involving Defendant Henderson, Lucas participated in surveillance and interrogation efforts as part of an undercover investigation team that included, among others, Cleveland Police Department's Captain Brian Heffernan ("Heffernan"), Task Force Officer Jamal Ansari ("Ansari"), and Detective Timothy Clark ("Clark"). *Id.* at 15, 18.

In the early afternoon of January 11, 2007 and at the direction of Lucas and Heffernan, marked patrol units conducted a stop of a green minivan driven by Madden and in which Henderson was a passenger. *See, e.g., id.* at 13-20. The purpose of the stop was to arrest Henderson on an outstanding warrant from the Cuyahoga County Court of Common Pleas. *See, e.g., id.* at 17, 50-51; Doc. 46. Henderson initially attempted to give the arresting police false identification, but Detective Clark identified him on the scene as "Carl Henderson." *See, e.g., id.* at 54-55, 109; Trial Tr. at 393-94 (Mar. 19, 2007). Upon his identification, the police transported Henderson to the Cleveland jail. *See, e.g.*, Trial Tr. at 111 (Mar. 16, 2007). At 5:17 p.m., the police booked Henderson under the name of "Kesioun Walker" for "Violation of State Drug Law." *See* Gov't Exh. 11.

As the police arrested Henderson and took him to the Cleveland City Jail, other officers separately took Madden into custody. *See, e.g.*, Trial Tr. at 60-61 (Mar. 16, 2007). Over the afternoon and evening of January 11, 2007, the police sought Madden's consent to search the Wynde Tree Residence. *See, e.g., id.* at 25-32. Madden initially refused, but finally agreed to allow the police to search her home. *Id.* Madden told police that they would find cash and marijuana

belonging to Henderson in the house. *Id*.

At approximately 9:00 p.m., Madden accompanied the officers to the Wynde Tree Residence. *Id.* at 120-21. At the home, the police found one Listerine bottle that apparently contained PCP, two bricks of marijuana, cash, other contraband, and several karaoke boxes with mailing labels addressed to"Kim." *Id.* at 37-38. The police confiscated the drugs, money, a "gun box w/ gun accessories [and] (6) six live 9mm rounds" and other contraband. *See, e.g.*, Def. Exh. A (Henderson). Special Agent Lucas then "formally" arrested Madden. Trial Tr. at 35 (Mar. 16, 2007).

Upon concluding the search of the Wynde Tree Residence, Lucas and Ansari went directly to the Cleveland jail to interview Henderson. *Id.* at 187-88. Lucas conducted Henderson's interview. *Id.* At the suppression hearing, Lucas testified that Henderson never asked to speak with an attorney during the interview; Henderson testified that he requested a lawyer during the interview. *Id.* at 193, 229; Trial Tr. at 429 (Mar. 19, 2007).

Lucas began the interview by advising Henderson of his Miranda rights and having him sign a Cleveland police rights waiver form. Trial Tr. at 188-89 (Mar. 16, 2007). Lucas then told Henderson that the police had just completed a search of the Wynde Tree Residence in which they found, among other things, PCP, marijuana, and cash. *Id.* at 190. Henderson denied that the house contained PCP, but took responsibility for the marijuana and cash. *Id.* Henderson also denied that Madden had any involvement with any potentially illicit activity involving Taylor and Lewis. *Id.* at 190-91. As part of the interview, Henderson and Lucas also discussed Henderson's involvement with Taylor and Lewis. *See* Gov't Exh. 12. Henderson then wrote a statement in which he took responsibility for "the weed & money that was found in the house and the stuff behind the chair." *See* Gov't Exh. 7. Henderson's entire written statement reads as follows:

> I leave [sic] at 2350 Wyndy [sic] Tree with my wife and kid Tekora Made [sic] and the weed & money that was found in the house and the stuff behind the chair belong [sic] to me. I had the boxes sent to 3555 E 153 St, and she came to pick me up from to [sic] motel she never came in she just picked me up. The boxes I'm talking about I you [sic] for the money. I let a friend of mine yoused [sic] my van. My wife don't know them.

*Id.*

The next day, Special Agent Lucas prepared a report of the investigation in which he described Henderson as arrested for "Federal Drug Violations" regarding his role in a PCP Distribution Organization." *See* Gov't Exh. 12. In part, Lucas's report reads as follows:

> HENDERSON stated that he resided at 2350 Wynde Tree Drive, Seven Hills, Ohio, with his wife, Tekora MADDEN and their daughter. HENDERSON claimed ownership of the marijuana, money, and Listerine bottle found in the residence. HENDERSON stated that the contents of the Listerine bottle, was not PCP. HENDERSON admitted that he had several music machines at his residence, so that he could hide the money he made from selling marijuana in them. HENDERSON stated that he had the machines mailed to another address, because he didn't want anyone to know where he lived. HENDERSON was asked who KIM was, because that is the name the boxes were addressed to. HENDERSON stated that "KIM" was a made up name he used to send the boxes to. HENDERSON stated that he had MADDEN drive him around, because he had a warrant on a gun case, and didn't want [sic] pulled over.

*Id.*

Special Agent Lucas's report also described what Henderson had told him about his relationship with Taylor and Lewis:

> HENDERSON state that he had met with TAYLOR and LEWIS at the hotel, but that MADDEN had waited in the car. HENDERSON admitted that he had loaned his minivan to TAYLOR and LEWIS. HENDERSON further stated that LEWIS and TAYLOR were active members of the NUTTY BLOC CRIPS gang, but that he (HENDERSON) was a non-active member of the gang.

*Id.*

On February 7, 2007, the Government filed an indictment that charged Henderson with one count of conspiracy to distribute and possess PCP, one charge of possession with the intent to

distribute PCP, two charges of felon-in-possession of a weapon, and related forfeiture charges. [Doc. 15-3.] On February 28, 2007, the Government filed a superceding indictment to add one count of possession with the intent to distribute an additional 100 grams of a PCP substance, i.e., the contents of the Listerine bottle found at the Wynde Tree Residence. [Doc. 59.] Henderson pleaded "Not Guilty" to the Government's charges. [Doc. 66.]

On February 26, 2007, Henderson filed a motion to suppress all evidence obtained during the January 11, 2007, seizure, questioning, and search of the Wynde Tree Residence. [Doc. 46.] The Government filed its opposition on March 14, 2007. [Doc. 75.]

On March 16 and 19, 2007, the Court conducted a hearing, during which it received evidence and heard argument related to Henderson's suppression request. [Docs. 81, 86.] This Opinion and Order follow from the facts and evidence presented by the parties at that suppression hearing.

## II. Legal Standard and Analysis

Henderson bases his instant suppression motion on two arguments. First, Henderson says that the police conducted an illegal search of the Wynde Tree Residence. *See* Doc. 46. Consequently, Henderson says that the Court must suppress any evidence seized and statements obtained from that search. *Id.* Second, Henderson claims that the police held him "incommunicado," without "immediate access to an attorney," and without prompt arraignment and proper processing of his charges. *Id.* In essence, Henderson says that the Court should suppress any statements he made during his January 11, 2007 interview with Lucas as involuntary or coerced. *Id.*

The Government contends that the police properly searched the Wynde Tree Residence and denies any impropriety in Henderson's arrest and custody. *See* Doc. 75. Further, Special Agent

Lucas testified that Henderson never asked to speak to a lawyer during his January 11, 2007 interview. *See* Trial Tr. at 193, 229 (Mar. 16, 2007). In further support of its position that Henderson's statement was voluntary, the government notes that both it and Henderson agree that Henderson made his incriminating statements within minutes of the start of the interview.

As a threshold matter, the Court notes that Henderson does not challenge the constitutional basis of his January 11, 2007 arrest. At the suppression hearing, counsel for the defense acceded that Henderson's January 11, 2007 apprehension "was a lawful arrest." Trial Tr. at 569 (Mar. 19, 2007). The Court recognizes this accession and further notes that, although Henderson provided false identification to the police, Special Agent Lucas and Detective Clark affirmatively identified Henderson as "Carl Henderson" before taking him into custody on a valid outstanding warrant for his arrest. As a result, the Court finds Henderson's January 11, 2007 arrest was lawful.

In his motion to suppress, Henderson principally complains that the police apprehended him upon an arrest warrant issued by the Cuyahoga County Court of Common Pleas, but then transported him to the Cleveland City Jail. *See* Doc. 46. The Court finds this argument unavailing. Cuyahoga County and the City of Cleveland share the status of political subdivisions of the State of Ohio. The law enforcement and court system of each of Cuyahoga County and Cleveland exist as State entities. Because each of Cuyahoga County and Cleveland must abide by the laws of Ohio's legislature and answer to its judiciary, the Court finds no consequence in the fact that the City of Cleveland, and not Cuyahoga County, held Henderson after his arrest on January 11, 2007.

Henderson further complains that he "was coerced into making statements, it will also show intimidation." [Doc. 46 at 4.] To the contrary, the Court finds Special Agent Lucas's testimony credible that Lucas advised him of his *Miranda* warnings" and that Henderson "[s]tated he

understood his Miranda warnings, and he signed the top part of a statement form waiving his rights." Trial Tr. at 188 (Mar. 16, 2007). *See also* Gov't Exh. 7.

In deciding whether a defendant's statement was involuntary, the Court considers the totality of the circumstances and determines whether law enforcement officials obtained the evidence by overbearing the will of the accused. *Haynes v. Wash.*, 373 U.S. 503, 513-14 (1963) (stating that "the question in each case is whether the defendant's will was overborne at the time he confessed") (quoting *Lynumn v. Ill.*, 372 U.S. 528, 534 (1963)). To establish the involuntariness of a custodial statement, the defendant must show coercion by the law enforcement officer. *Colo. v. Connelly*, 479 U.S. 157, 170 (1986) (finding that "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion"). *See also United States v. Murphy*, 107 F.3d 1199, 1205-06 (6th Cir. 1997) (holding that, absent police coercion, the defendant voluntarily confessed despite his limited mental capacity).

Both Lucas and Henderson testified that Henderson made a statement almost immediately after Lucas began interviewing him. *See, e.g.*, Trial Tr. at 187-93 (Mar. 16, 2007); Trial Tr. at 427-30 (Mar. 19, 2007). At the suppression hearing, Henderson did not allege or imply that Lucas or the other officers coerced his statement. *See* Trial Tr. at 427-30 (Mar. 19, 2007). Henderson testified, somewhat unintelligibly, that Special Agent Lucas said:

> we are going to get straight to the point, that they been to my house, searched my house, been to the hotel, searched the hotel. And like – and asked me – what did he say – are you going to confess to everything that was in your house? And I said, yeah, I'm going to confess to it.

*Id.* at 428-29. The Court finds nothing coercive in this exchange and, as a result, rejects Henderson's claim that he made any involuntary statements during his January 11, 2007 interview with Special Agent Lucas.

Even if Henderson could show that he involuntarily made his January 11, 2007 statement, he must still show that Lucas created sufficient pressure to force him to do so and that he did not possess the capacity to resist Lucas's coercion. *See Connelly*, 479 U.S. at 170. At the suppression hearing, Henderson did not make such a showing; nor would the Court find as persuasive any attempt to make such a showing. As counsel for defense stated, Henderson "has experience with the justice system." Trial Tr. at 86 (Mar. 16, 2007). The Court credits this "experience" and finds that Lucas did not coerce Henderson's statements during the January 11, 2007 interview.

Relatedly, Special Agent Lucas and Henderson provided conflicting testimony at the suppression hearing regarding Henderson's indication that he wanted to speak to a lawyer. At the hearing and in reviewing the trial transcript, the Court believes that Henderson willingly talked to Lucas about the police search at the Wynde Tree Residence and its potential impact on Madden, his wife. The Court also notes that Henderson willingly discussed "people" in Cleveland, but refused to give Lucas any information regarding events or individuals related to California. In his January 12, 2007 investigation report, Special Agent Lucas discussed Henderson's recalcitrance and noted that "HENDERSON stated that once he talked to his attorney, he would cooperate with the police." *See* Gov't Exh. 12. Thus, the Court finds that Henderson may have referred to an attorney during his January 11, 2007 interview with Special Agent Lucas, but credit's Lucas's suppression hearing testimony that Henderson did not specifically request a lawyer to continue the interview.

Finally, in a separate Order and Opinion, the Court has found as unconstitutional the January 11, 2007 police search of the Wynde Tree Residence. The Court understands that the Government does not contest that Henderson enjoyed an interest in the Wynde Tree Residence that gives him standing to challenge the search of that location. *Rakas v. Ill.*, 439 U.S. 128, 148 (1978).

Henderson's statements regarding the contraband at the Wynde Tree Residence cannot be used in the Government's case-in-chief as such statements relate to evidence that has been suppressed. *See, e.g.*, *Wong Sun v. United States*, 371 U.S. 471,485-92 (1963). The Supreme Court long-ago espoused this "exclusionary rule," *see, e.g.*, *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1919), and has since stated the rule's scope:

> The Government cannot violate the Fourth Amendment . . . and use the fruits of such unlawful conduct to secure a conviction. Nor can the Government make indirect use of such evidence for its case, or support a conviction on evidence obtained through leads from the unlawfully obtained evidence. All of these methods are outlawed, and convictions obtained by means of them are invalidated, because they encourage the kind of society that is obnoxious to free men.

*Walder v. United States*, 347 U.S. 62, 64-65 (1954) (Frankfurter, J.).

In analyzing any "fruit of the poisonous tree" case, the Court undertakes a four-part analysis. First, it identifies the "poisonous tree," i.e., the constitutional violation. Second, the Court identifies the "fruit," i.e., the evidence the Government seeks to introduce. Third, the Court determines whether the "fruit" comes from the "tree," i.e., whether there exists a causal link between the constitutional violation and the Government's proposed evidence. Finally, if the fruit did come from a poisonous tree, the Court weighs any facts that may justify the conclusion that the poison from the fruit has dissipated. Thus, the Court will not suppress evidence if the taint of the original constitutional violation has sufficiently attenuated.

In this case, and as discussed in a separate Opinion and Order, the police violated the Fourth Amendment rights of Henderson's wife, Tekora Madden, when they impermissibly seized her at the scene of the roadside stop of the couple's minivan on January 11, 2007. From this "poisonous tree," Special Agent Lucas and other undercover officers obtained Madden's eventual consent to search the Wynde Tree Residence in which they found the "fruits" of PCP, marijuana, cash, and other

contraband. Lucas then used this "fruit of the poisonous tree" in his interview of Henderson to secure his statement that "the weed & money that was found in the house and the stuff behind the chair" belonged to Henderson, not Madden. *See* Gov't Exh. 7. Henderson also denied responsibility for the PCP found in the Wynde Tree Residence. *See, e.g.*, Gov't Exh. 12.

In examining the causal connection and any attenuation of the evidence seized at Madden's home and Henderson's statements in his interview with Lucas, the Court first notes that the police seized evidence in the January 11, 2007 search of the Wynde Tree Residence as the result of their earlier violation of Madden's constitutional rights. Special Agent Lucas and the other undercover officers then went directly to Henderson and confronted him with this evidence. Using this evidence, the police elicited statements from Henderson regarding the contraband found in the house. As a result, because a causal connection exists between the tainted evidence from the January 11, 2007 search of the Wynde Tree Residence search and the information gained by Lucas from Henderson in his January 11, 2007 interview regarding that location, the Court suppresses Henderson's statements made during the interview regarding the contraband found at the Wynde Tree Residence.

In contrast, in the interview, Henderson makes statements regarding his involvement with Taylor and Lewis. Such statements are distinct and unrelated to Henderson's statements regarding the Wynde Tree Residence: nothing suggests the presence of Taylor or Lewis at the Wynde Tree Residence; sufficient evidence independent of reference to the contraband found at the residence supported the warrant authorizing the January 11, 2007 search of Room 106 at the Extended Stay America motel. Further, Henderson received his *Miranda* warning and voluntarily gave statements about Taylor and Lewis. As a result, the Court does not suppress those statements.

Thus, pursuant to the exclusionary rule, the Court suppresses any statements received related to the Wynde Tree Residence and obtained from Henderson after and because of the January 11, 2007 search of the Wynde Tree Residence. Relatedly, the Court allows relevant evidence of Henderson's purported involvement in the suspected PCP drug ring that does not relate to the January 11, 2007 search of the Wynde Tree Residence.

## III. Conclusion

For these reasons, the Court **GRANTS** Henderson's motion to suppress as it relates to statements obtained as the result of the January 11, 2007 search of the Wynde Tree Residence.

IT IS SO ORDERED.

Dated: April 13, 2007

s/ *James S. GWIN*
JAMES S. GWIN
UNITED STATES DISTRICT JUDGE